UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| COLLEEN BRISETTE, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:13-cv-00447-GZS |
| FRIENDLY'S ICE CREAM, LLC, | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION**

In this action, Plaintiff Colleen Brisette asserts a claim of age discrimination against Defendant Friendly's Ice Cream, LLC. The matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 19).[1]

As explained below, following a review of the pleadings, and after consideration of the parties' arguments, the recommendation is that the Court grant in part and deny in part the motion.

**BACKGROUND**

Plaintiff was born in 1954. In 1973, Plaintiff started working for Friendly Ice Cream Corporation ("FICC") as a grill and fountain worker at the Westgate restaurant in Portland, Maine. Plaintiff was promoted from a grill and fountain worker to a shift supervisor, and then she was promoted from shift supervisor to assistant manager. Plaintiff worked at the Westgate restaurant for almost twenty years, until she moved to Augusta, Maine around 1992. After about a year, one of FICC's District Managers called Plaintiff to tell her that they needed help at the Augusta, Maine

---

[1] The Court referred the motion for a report and recommended decision.

restaurant and to ask if she would reapply. Plaintiff reapplied for a grill cook position because that was the available position at that time. (Def.'s Statement of Material Facts, ECF No. 20, ¶¶ 1-7 (DSMF).)

Plaintiff would remain employed at the Augusta restaurant through September 2013. (*Id.* ¶ 264.) By that time, FICC had gone through bankruptcy, with Defendant Friendly's Ice Cream, LLC purchasing the assets of FICC on or around January 9, 2012.[2] (*Id.* ¶¶ 15-18.)

In 2005, Bonny Coutts became the General Manager of the Augusta restaurant. Coutts promoted Plaintiff to a manager position. As a manager, Plaintiff was trained on Defendant's fair treatment policy, sexual harassment policy and its open door policy. Plaintiff also was aware of the We Care Line, an employee hotline number posted in the Augusta restaurant. After she became a manager in Augusta, Plaintiff continued to work the grill cook position in addition to her manager duties. (*Id.* ¶¶ 8-11.)

In 2008, Lenny Carrier became the General Manager of the Augusta restaurant. Carrier is roughly six years younger than Plaintiff. (*Id.* ¶¶ 12-13.) Plaintiff alleges that Carrier subjected her to harsh treatment during her employment, for the purpose of forcing Plaintiff to resign. (*Id.* ¶ 21.) Plaintiff describes Carrier as being, generally, very harsh. (*Id.* ¶ 22.) According to Plaintiff, Carrier was "in the faces" of employees all of the time. (*Id.* ¶ 23.) Plaintiff did not like working with Carrier because of the way he treated her. (*Id.* ¶ 24.)

At her deposition, Plaintiff testified to several incidents that, in her view, support her belief that she was discriminated against on the basis of her age. (*Id.* ¶ 25.) On one occasion, when Plaintiff and a grill cook named Cloutier could not keep up with orders, Carrier got up close to

---

[2] Both entities will be referred to herein as Defendant.

Cloutier's and Plaintiff's faces and told the two of them that they "sucked." Cloutier is at least ten years younger than Plaintiff. (*Id.* ¶¶ 26-31.)

Prior to working for Carrier, Plaintiff worked as an opening manager at the Augusta, Maine restaurant, and did not work night shifts. She also generally had Sundays and Mondays off, and her Saturday shifts ended by 3:00 p.m. Sometime in 2009, about six months after Carrier became the General Manger in Augusta, Todd Mosher and Carrier offered Plaintiff a raise and asked that she begin to work nights. Plaintiff told Todd Mosher and Carrier that she did not want to work nights. Nevertheless, on the next work schedule, Carrier scheduled Plaintiff to work the closing shift on Saturday and Sunday. (*Id.* ¶¶ 32-38.) Upset that Carrier had scheduled her to work nights when Plaintiff had not typically worked nights in the past, in the book in which employees would note their requests for vacation and other time off, Plaintiff requested all Saturday nights, Sundays and Mondays off for the remainder of the year. (*Id.* ¶ 42.) Plaintiff believes that after she requested every single Saturday night, Sunday and Monday off, Carrier removed the request book from the restaurant. (*Id.* ¶ 43.)

In 2011, Plaintiff earned 16 hours of vacation time that she did not use. However, Carrier would not let her take the 16 hours of vacation and, according to Plaintiff, she was never paid for this time. (*Id.* ¶¶ 46-49.) Plaintiff understands that another employee, 15 years younger than she, was treated similarly. (*Id.* ¶¶ 50-51.)

On Mother's Day 2012, Carrier pushed a pancake in Plaintiff's face and also into the face of a 25-year-old employee after a customer complained that the pancake was not fully cooked. Carrier told them that they needed to make sure that food was fully cooked when sent out to the dining room. (*Id.* ¶¶ 55-56, 58-60, 62.)

On another occasion, sometime before 2012, Carrier became angry with Plaintiff when she failed to return a line-up sheet to its proper place. After having reviewed the line-up sheet at the cash register area of the restaurant, Plaintiff forgot to return it to its holder, and instead left the lineup sheet near the cash register. When Carrier arrived at the restaurant and found the line-up in the cash register area, he had an angry look. Carrier gritted his teeth, raised his fists towards Plaintiff, gestured to where the line-up sheet was supposed to be kept, and yelled at her that the line-up goes on the holder. (*Id.* ¶¶ 63-67.) On another occasion, a coworker overheard Carrier ask himself, while punching the schedule, "What is Colleen up to?" Plaintiff only heard of this from another employee who observed Carrier's behavior and does not know what Carrier was referring to.[3] (*Id.* ¶¶ 68-71.)

Plaintiff testified at her deposition that there were three age-related comments she experienced in the workplace, two by Carrier and one by another employee. The first two occurred in August 2008, during Carrier's first week as General Manager of the Augusta, Maine restaurant. At the time, Plaintiff was approximately 54 years old. Carrier pulled Plaintiff aside and asked her how long she planned to continue working. Plaintiff told Carrier that she planned on working until

---

[3] At her deposition, Plaintiff discussed with defense counsel many incidents in which she received some criticism from Carrier. In its Statement of Facts, Defendant itemized many of the incidents and Plaintiff's reaction to them, such as criticism from Carrier for refusing to cook a grilled cheese sandwich for a server; for failing to check the kitchen prior to leaving the restaurant, and leaving the fryers and hood vents on; for leaving the air system and cellar lights on all night; for leaving the kitchen air conditioner on after closing; for putting too much product on the steam table; for not doing a line check; for not understanding the prep or thaw process; for putting crew on breaks during dinner shifts or meal periods; for putting employees on breaks during meal periods; for allegedly clocking out a waitress; for failing to check up on labor concerns and for keeping crew members on over hours; for having eight employees on at 8:00 P.M. during a Wednesday evening; for poor performance by staff on which there were three server trainees working; for failing to inform crew of a snowstorm; for hanging her shirt on a rack; for the appearance of the fountain area following a busy spell; for not paying attention to detail; for not singing the birthday song; for not putting food under the heat lamp; for poor communication among the team members. At the conclusion of this long list of statements of supposedly "material" facts, Defendant states, and Plaintiff admits, that Plaintiff does not allege that any of the examples of Carrier's workplace criticism discussed in these paragraphs evidence discrimination or retaliation, or form the basis of her claims. (DSMF ¶¶ 89-159.)

4

she was 65. Carrier responded, according to Plaintiff, "Really, no really, how long are you really going to work for Friendly's?" Plaintiff responded, "You're funny," and Carrier then stated, "I'm as serious as a heart attack. You're getting too old for this job." (*Id.* ¶¶ 160-166; Pl.'s Statement of Material Facts, ECF No. 30, ¶ 2 (PSMF).) Sometime within the next 45 minutes, one of Plaintiff's co-workers named Edgar Shea[4] told Plaintiff that she was "older than dirt." (DSMF ¶ 167.) That day, Plaintiff told Carrier that she did not appreciate Shea's comments about her age. (*Id.* ¶ 175.) After completing her shift, Plaintiff called her former General Manager, Bonny Coutts, and told her about Carrier's comment. (PSMF ¶ 3.) Coutts told Plaintiff that Coutts was going to report the alleged comment to Todd Mosher, the District Manager. After learning of Carrier's alleged comment, Todd Mosher reassured Plaintiff that she should not worry about Carrier because Mosher would protect her job.[5] (DSMF ¶¶ 171-173.) Subsequently, Carrier approached Plaintiff and told Plaintiff that he did not mean what he said about Plaintiff being too old for the job.[6] (*Id.* ¶ 174.) Carrier also talked to Shea, and Shea did not make any comment about Plaintiff's age for a couple of days.[7] (*Id.* ¶¶ 161-177.)

---

[4] Shea was not Plaintiff's supervisor and he had no influence over Plaintiff and/or her schedule.

[5] Coutts testified at her deposition that Plaintiff brought a complaint of age discrimination to her attention and that she (Coutts) passed that complaint on to Mosher. (PSMF ¶¶ 21-22.) Plaintiff testified at her deposition that, as a result of this, Mosher told Plaintiff, "I've got your back." (DSMF ¶ 254.) Mosher testified, on the other hand, that he had no recollection of any issue between Plaintiff and Carrier and that, had he been informed that Plaintiff accused Carrier of telling her she was "getting to old for this job," he "would certainly want to consult HR as to how to properly handle that scenario." (PSMF ¶¶ 24-25; Mosher Dep. at 12-13, ECF No. 31-4, PageID # 520.) At some point, Plaintiff's husband, Ralph Brissette, wrote a letter to Defendant's president, copied to Mosher, saying that someone needs to look into the way Carrier was treating Plaintiff. (PSMF ¶¶ 16-17.)

[6] Plaintiff offers a qualification: "Carrier made the statement because Coutts told him that he would be fired if Brissette resigned." (Pl.'s Opposing Stmt. ¶ 174.) At his deposition, Carrier denied any knowledge of an issue between himself and Plaintiff. (PSMF ¶ 26.)

[7] Shea evidently made further comments of some kind. (DSMF ¶ 177.) Shea left Friendly's employ by the end of 2009. (*Id.* ¶ 178.)

The third and final age-related comment alleged by Plaintiff concerned a job-required safety certification. At a manager's meeting held at the end of 2012, Carrier asked Plaintiff if she really wanted to get recertified for ServSafe.[8] (*Id.* ¶¶ 179-180.) Currier allegedly stated, "It's good for five years, you know." (*Id.* ¶ 181.) Plaintiff interpreted that comment to be an insinuation that Plaintiff's time with the Company may be ending; as if she should not bother because she would not work for the Company that much longer. (*Id.* ¶ 184.) Plaintiff admitted that Carrier did not prevent Plaintiff from getting the ServSafe certification, and Carrier scheduled Plaintiff to have the test administered and she in fact completed the certification. (*Id.* ¶¶ 179-188.)[9]

Plaintiff alleges that Carrier reduced her hours in December 2012 to make Plaintiff ineligible for paid vacation time in 2013. (*Id.* ¶ 196; PSMF ¶ 9.) Plaintiff typically used her three weeks of vacation as follows: one week in June, one week in October, and one week in December. Plaintiff took one week of vacation at the beginning of December 2012. Plaintiff claims that Carrier cut her hours in December 2012 until January 2013. According to Plaintiff, her hours for the week following December 10, 2012, were cut almost in half to around 23 hours. Plaintiff's hours did not remain at 23 per week after December 2012. After the new-year, 2013, Plaintiff's hours went back up again. (*Id.* ¶¶ 196-203.)

Plaintiff claims that in 2012 she was about 50 hours short of the 1,900 hours she would need to work in 2012 to be eligible for three weeks of paid vacation in 2013. (*Id.* ¶ 204.) Plaintiff has admitted that Carrier's alleged reduction in her hours in December 2012 is the only basis for

---

[8] The ServSafe program provides food safety training, exams and educational materials to foodservice managers and employees. As a condition of employment, Defendant requires that all of its restaurant staff and managers undergo ServSafe training and obtain a ServSafe certification.

[9] Joking about age was something Plaintiff engaged in with other employees. (DSMF ¶¶ 191-195.) However, viewed in the light most favorable to Plaintiff, the fact that Plaintiff joked with friends does not entitle Defendant to summary judgment.

6

her claim that Carrier sabotaged her paid vacation for 2013 and reflects the only time that she had any issue with her hours. (*Id.* ¶ 205.) Plaintiff did not work the same number of hours each week. Throughout 2012, Plaintiff's hours varied on a weekly basis. (*Id.* ¶ 205-209.) Citing 53 pages of payroll summaries, Defendant asserts that a one-week reduction to around 25 hours after a week exceeding 35 hours was not unusual. (ECF No. 23-1). The summaries show that for 2012, Plaintiff's weekly hours fell below 30 a total of 13 times: twice in January, once in March, once in April, twice in May, once in the week ending May and beginning June, once more in June, twice in September, twice in October, and once in December.[10]

Around December 10, 2012, Plaintiff called Patty Newell, Plaintiff's District Manager at the time, to ask Newell about Plaintiff's hours being cut. (*Id.* ¶ 223.) A meeting occurred on December 12, with Plaintiff, Newell and Carrier in attendance and Carrier stated that he had cut her hours because she was slow and lazy and a class C supervisor. (*Id.* ¶¶ 224-226.) Newell agreed with this assessment and told Plaintiff that although she loved Plaintiff as a friend, Plaintiff would need to start working on her management skills. (*Id.* ¶¶ 227-28.) Plaintiff denied being slow and lazy. (*Id.* ¶ 230.)

After the December 12, 2012, meeting, on one occasion, Carrier mentioned that Plaintiff was too close to the crew, suggested that she was not holding her crew accountable because she was friends with them, advised Plaintiff that she should not give breaks to more than one server at a time, and advised her to call the manager on duty the next time a customer complained about food not being cooked properly. (*Id.* ¶¶ 234-238.) Carrier did not give Plaintiff any written list of the ways she could improve running a shift. (*Id.* ¶ 239.)

---

[10] Averaged over 52 weeks, the 1900-hour requirement for paid vacation requires an employee to work 36.54 hours per week. With three weeks of vacation, which Plaintiff had in 2012, the average weekly hours needed to achieve 1900 hours rises to 38.78 hours. The records reflect that Plaintiff worked more than 36 hours in fewer than 30 weeks, and never worked more than 41 hours in any week.

Plaintiff admits that she discussed the alleged cut in hours with Newell and Carrier, and that thereafter her hours were not reduced again, and actually returned to the level at which they had been before the cut in December 2012. (*Id.* ¶¶ 243-244.) Plaintiff testified that just before the summer of 2013, Carrier "started messing around with [her] schedule," and would have her work split shifts (working 12-to-2, and then 5-to-8 in the same day). (PSMF ¶ 12, Brissette Dep. at 171, PageID # 218.) However, a review of the scheduling records reveals that this only occurred on April 23, 2013, a day on which she worked a total of 10.5 hours. (ECF No. 23-2, PageID # 450.)

Plaintiff admits that Carrier never forced her to resign her employment. (*Id.* ¶ 255.) Plaintiff was "bound and determined" that nobody, including Carrier, was going to force her to resign her position with Defendant after 39 years, and her separation from Defendant had nothing to do with alleged discrimination or retaliation. (*Id.* ¶¶ 256-57.) Plaintiff voluntarily left in September 2013 for personal reasons. (*Id.* ¶¶ 258-63.)

*Plaintiff's Subjective Experience of Carrier's Criticism*

Before Carrier took over the Augusta restaurant, Plaintiff would whistle in the door when she came to work. (PSMF ¶ 1.) After Carrier arrived, he criticized everything for which one could be criticized. (*Id.* ¶ 4.) Carrier was always "on Brissette's case." (*Id.* ¶ 5.) Plaintiff would go home feeling frustrated because it was "stupid stuff," and that Carrier was acting like they were "in the military." (*Id.* ¶ 6.) This "nitpicking" was constant and others also experienced it. (*Id.* ¶ 7.) Carrier would record critical findings in "the red book." (*Id.* ¶ 10.) On one occasion, Carrier wrote that Plaintiff left the restaurant dirty, and that Plaintiff was "just here waiting on time to tick away." Plaintiff, however, "would never leave a place filthy and dirty like that." (*Id.* ¶ 11.) This steady emphasis on critical feedback caused Plaintiff stress and frustration, lowered Plaintiff's self-esteem, and reduced the pleasure she found in her work, which feeling went away upon her

retirement. (*Id.* ¶¶ 8, 13.) Plaintiff's husband, Ralph Brissette, testified that after Carrier took over as general manager, there was a marked difference in Plaintiff's personality, as she became more depressed and agitated, and could not understand why she was being treated the way she was. (*Id.* ¶ 14.) Ralph Brissette knew when Carrier worked because Plaintiff would be agitated and depressed upon her return from work. (*Id.* ¶ 15.)

## DISCUSSION

Plaintiff's Complaint contains two counts. Count I asserts "age discrimination" in violation of the Maine Human Rights Act. (Complaint ¶ 23.) Count II asserts "retaliation" in violation of the Maine Human Rights Act. (*Id.* ¶¶ 28.) However, in her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Plaintiff "stipulates to the dismissal of Count II for retaliation." (Opposition at 1 n.1.) Consequently, the only claim advanced by Plaintiff is her age discrimination claim. With respect to that claim, Plaintiff argues that Defendant is liable to her for subjecting her to "a pervasive hostile work environment based upon her age." (Opposition at 1.) Defendant maintains that the record does not support an age discrimination claim, including a claim based upon a hostile work environment.

**A.     Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

The Court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.      Hostile Work Environment**

"The [Maine Human Rights Act] makes it unlawful for an employer to 'discriminate with respect to ... terms, conditions or privileges of employment.'" *Flood v. Bank of Am. Corp.*, No. 14-1068, 2015 WL 855752, at *6 (1st Cir. Feb. 27, 2015) (quoting 5 M.R.S. § 4572(1)(A)). "That provision, in turn, authorizes a claim for hostile work environment." *Id.* (citing *Watt v. UniFirst Corp.*, 969 A.2d 897, 902 (Me. 2009), and 94–348–003 Me. Code R. § 10(1)(C) (Maine Human Rights Commission regulations)). To succeed on such a claim, a plaintiff must demonstrate membership in a protected class and the experience of unwelcome harassment based on such membership. *Id.* Additionally, to be actionable, the harassment must be sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; and the harassment must be both objectively and subjectively offensive. *Id.* Lastly, there must be some basis for employer liability. *Id.*

As a general rule, the Maine Supreme Judicial Court looks to federal precedent as persuasive authority when interpreting the Maine Human Rights Act, particularly when the language of the MHRA mirrors a federal anti-discrimination statute. *Fuhrmann v. Staples Office*

*Superstore E., Inc.*, 2012 ME 135, ¶ 27, 58 A.3d 1083, 1095; *Scott v. Androscoggin Cnty. Jail*, 2004 ME 143, ¶ 16, 866 A.2d 88, 93; *Doyle v. Dep't Of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48, 54 n.7. Indeed, when articulating the standard of liability for a hostile work environment, the Law Court repeatedly has drawn directly on federal precedent. *Watt*, 2009 ME 47, ¶ 22, 969 A.2d at 903 & n.4; *Doyle*, 2003 ME 61, ¶ 23, 824 A.2d at 56; *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976-77 (Me. 1996).

"To establish a hostile work environment, a plaintiff must show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment." *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 43 (1st Cir. 2011) (paraphrasing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "This is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 21. The totality of the circumstances inquiry calls for consideration of "[t]he accumulated effect of incidents" over time. *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)). In some cases, a single incident of harassment may be sufficient to support a claim, provided that the incident was "severe enough to cause the workplace to become hostile or abusive." *Doyle*, 2003 ME 61, ¶ 23, 824 A.2d at 56 (citing *Nadeau,* 675 A.2d at 976). "Although the conduct may be both [severe and pervasive],

only one of the qualities must be proved in order to prevail. The severity of the conduct may vary inversely with its pervasiveness." *Nadeau*, 675 A.2d at 976.

A hostile environment, however, is distinct from "the ordinary, if occasionally unpleasant, vicissitudes of the workplace." *Harris*, 510 U.S. at 21. A hostile work environment involves conduct that is "extreme [enough] to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (1998). "Rudeness or ostracism, standing alone, usually is not enough." *Noviello*, 398 F.3d at 92. The standard must be vigorous enough that anti-discrimination law does not develop into a "general civility code." *Faragher*, 524 U.S. at 788. "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." *Flood*, --- F.3d at ---, 2015 WL 855752, at *7 (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)). "Toiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome, but [anti-discrimination law] does not protect employees from the 'ordinary slings and arrows that suffuse the workplace every day.'" *Ahern v. Shinseki*, 629 F.3d 49, 59 (1st Cir. 2010) (quoting *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 425 (1st Cir. 1996)).

"'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (quoting *Gorski v. N.H. Dep't of Corr.,* 290 F.3d 466, 474 (1st Cir. 2002)).

**C.   Analysis**

Defendant argues that the summary judgment record cannot support a finding that Plaintiff experienced a hostile work environment (1) because the circumstances were not severe or pervasive and thus did not alter the conditions of her employment, and (2) because the adversity that Plaintiff perceived from Carrier was not actually based on Plaintiff's age. (Motion at 15-17.)

Plaintiff argues that Carrier's age-related comments, hostile gestures, adverse shift changes (changing Plaintiff to night shifts and later reducing her hours), and general negativity provide support for her claim. (Opposition at 2-6, 8-10.)

While the factual record could support Defendant's contention that Carrier's alleged treatment of Plaintiff is not related to Plaintiff's age, the record also could support a finding that Carrier's conduct created an age-based hostile work environment. First, a fact finder could find that on more than one occasion, Carrier made direct, negative, age-related comments to Plaintiff. A fact finder, therefore, could conclude that Carrier harbored some animus toward Plaintiff based on Plaintiff's age. Additionally, although the changes in Plaintiff's work hours might not support an age discrimination claim based on "adverse employment measures,"[11] the changes could nevertheless support a hostile work environment claim as "prominent points in an underlying pattern of hostility." *Flood*, --- F.3d. at ---, 2015 WL 855752, at *8. Furthermore, although arguably not especially severe in any instance, a fact finder could consider Carrier's consistent criticism of Plaintiff over what one could rationally view as insignificant matters to be evidence

---

[11] In support of its challenge to any claim of age discrimination based on a discrete-act (as opposed to a hostile environment theory), Defendant argues that "a one-week variation of hours in a normal, fluctuating schedule is not an adverse employment action." (Motion at 7, citing *Cham v. Station Operators, Inc.*, 685 F.3d 87 (1st Cir. 2012).) The First Circuit's opinion in *Cham* did not involve a hostile work environment claim. *Cham*, 685 F.3d at 92. Instead, the Court sought to determine whether discrete employment actions were serious enough to be considered adverse for purposes of a Title VII action. *Id.* at 94-95. In that context, the Court held that the loss of "three shifts" on holidays "simply does not rise to the level of an adverse employment action in the context of a workplace where schedules fluctuate and no employee is entitled to any given shift," which holding was reinforced by the fact that "the fluctuation in hours … did not affect [the plaintiff's] benefits." *Id.* at 94-95. On the other hand, for purposes of a related FMLA retaliation claim, the Court assumed *arguendo* that a reduction in average weekly hours from 40.83 pre-leave to 30.38 post-leave could be viewed as an adverse employment action, even though the plaintiff was not guaranteed any set shifts. *Id.* at 95. For purposes of summary judgment, the fact that Carrier reduced Plaintiff's hours intentionally is established on the record, as is the fact that the change in hours deprived Plaintiff of a vacation benefit she had obtained in the prior year. Whether the conduct is sufficient to support a discrimination claim based on adverse employment measures, however, is not controlling in this hostile work environment claim.

of pervasive mistreatment. This is a particular possibility given that a fact finder could also conclude that at least one instance involved a false report by Carrier.[12]

In sum, although Defendant can present evidence that Carrier treated other employees harshly, the evidence is not dispositive as to the existence of an age-based hostile work environment. Indeed, the reasons for the mistreatment could be varied based on issues unique to each individual, and conceivably could include some unlawful bases. Given Carrier's negative reference to Plaintiff's age, and his mistreatment of Plaintiff, the record contains sufficient evidence from which a fact finder could conclude that as to Plaintiff, Carrier's conduct created a hostile work environment that was age-related. As mentioned above, generally, the jury is to "decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (quoting *Gorski v. N.H. Dep't of Corr.,* 290 F.3d 466, 474 (1st Cir. 2002)). Defendant, therefore, is not entitled to summary judgment on Count I of the Complaint.

## CONCLUSION

Based on the foregoing analysis, the recommendation is that the Court grant in part and deny in part Defendant's Motion for Summary Judgment (ECF No. 19). Specifically, the recommendation is that the Court grant the motion as to Count II of the Complaint,[13] and deny the motion as to Count I of the Complaint.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

---

[12] In reference to this particular false report regarding Plaintiff allegedly leaving the restaurant filthy, Carrier wrote that Plaintiff was "just waiting on time to tick away," which statement could reinforce a finding that Carrier harbored animus toward Plaintiff based on Plaintiff's age.

[13] As mentioned above, Plaintiff agreed to the dismissal of Count II. Given that the summary judgment record does not support the retaliation claim set forth in Count II, the entry of summary judgment, as opposed to dismissal, is warranted.

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 31st day of March, 2015.